**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| VINCENT R. JOHNSON and JULIE JOHNSON, | No. C06-3073-MWB |
| Plaintiffs, | **MEMORANDUM OPINION AND** |
| vs. | **ORDER REGARDING** |
| AMERICAN LEATHER SPECIALITIES CORP. and SHOPKO STORES, INC., | **DEFENDANTS' MOTION FOR** |
| Defendants. | **PARTIAL SUMMARY JUDGMENT** |

_____

### TABLE OF CONTENTS

**I. INTRODUCTION AND BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . 7
    *B. Choice Of Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *C. Choice Of Law Rules* . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    *D. The § 145(2) "Contacts"* . . . . . . . . . . . . . . . . . . . . . . . . . 19
        *1. The place where injury occurred* . . . . . . . . . . . . . . . . . . 19
        *2. The place where conduct causing the injury occurred* . . . . . 20
        *3. Place of domicile, residence, incorporation, or business* . . . . 21
        *4. Place where the relationship was centered* . . . . . . . . . . . 22
        *5. Summary of § 145(2) contacts* . . . . . . . . . . . . . . . . . . 23
    *E. The § 6 Factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        *1. Needs of the interstate and international systems* . . . . . . . . 24
        *2. Relevant policies of the forum and other interested states* . . . 25
        *3. Ease of determination and application of the law* . . . . . . . . 27
        *4. Other § 6(2) factors* . . . . . . . . . . . . . . . . . . . . . . . 27

   a.  *Protection of justified expectations* . . . . . . . . . . . . . 28
   b.  *Basic underlying policies* . . . . . . . . . . . . . . . . . . 28
   c.  *Certainty, predictability and uniformity of result* . . . . 28
 *F.* *Conclusion As To Conflict Of Law* . . . . . . . . . . . . . . . . . . . . . 29
 *G.* *Federal Constitutionality of Iowa Code § 613.18(1)* . . . . . . . . . . . 29
  *1.* *Overview of the Fifth Amendment's Takings Clause* . . . . . . 29
  *2.* *Cognizable property interest* . . . . . . . . . . . . . . . . . . . . . . 31
  *3.* *Taking of property* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
 *H.* *Iowa's Inalienable Rights Clause* . . . . . . . . . . . . . . . . . . . . . . . 36
 *I.* *Application Of Iowa Code § 613.18(1)* . . . . . . . . . . . . . . . . . . . 39

*III.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On November 6, 2006, plaintiffs Vincent R. Johnson and Julie Johnson (collectively "the Johnsons" unless otherwise indicated) filed a complaint against defendants American Leather Specialties Corp. ("American Leather") and Shopko Stores, Inc. ("Shopko") alleging eight causes of action related to injuries sustained by plaintiff Vincent Johnson when a dog leash failed, causing the leash's cord to snap back, striking Vincent in the left eye. The eight causes of action asserted are for: strict products liability against American Leather (Count II); breach of express warranty against both Shopko and

American Leather (Count III); breach of implied warranty against American Leather (Count IV); negligent design and manufacture against American Leather[1] (Count V); negligent distribution against American Leather (Count VI)[2]; negligence against Shopko

---

[1]With respect to plaintiffs' claim of negligent design and manufacture against defendant American Leather, plaintiffs allege that defendant American Leather was negligent in the following three respects:

> A.    In failing to design a radius into the die that was used to manufacture the plastic leash housing so as to design out the sharp edge at the exit hole which was a foreseeable shear point for the leash cord;.

> B.    In failing to specify and/or install a grommet in the exit hole so as to protect the leash cord from shearing forces as the cord extended, retracted and otherwise served as a restraint;

> C.    In failing to place suitable and readable instructions and warnings on the housing of the leash.

Complaint at ¶¶ 26(A)-(C).

[2]With respect to plaintiffs' claim of negligent distribution against American Leather, plaintiffs allege that defendant American Leather was negligent in the following three ways:

> A.    In failing to subject the design of the leash to a product safety review, prior to placing the leash in the stream of commerce;

> B.    In failing to test the leash for foreseeable safety risks, prior to placing the leash in the stream of commerce;

> C.    In placing the leash in the stream of commerce when it knew, or should have known, that the leash was subject to a mode of failure that would foreseeably result in personal injury

(continued...)

(Count VII)[3]; and, loss of consortium against both Shopko and American Leather (Count IX).[4]

The Johnsons' Complaint alleges that Vincent purchased the dog leash from defendant Shopko and that defendant American Leather distributed the leash under the trademark, "Canine Country." Compl. at ¶ 4. The Complaint alleges that this court has subject matter jurisdiction by virtue of diversity of citizenship of the parties, 28 U.S.C. § 1332.

Defendants American Leather and Shopko have filed a motion for partial summary judgment in which they seek the dismissal of all of plaintiffs' claims, except for plaintiffs' claim that defendants were negligent in failing to place suitable warnings on the leash, on the ground that defendants are immune from such claims under Iowa Code § 613.18(1).

---

[2](…continued)
> to users and consumers.

Complaint at ¶¶ 29(A)-(C).

[3]Concerning plaintiffs' claim of negligence against Shopko, plaintiffs allege that Shopko was negligent in the following three respects:

> A.     In failing to perform a product safety review of the leash before placing it in its stores for retail sale;
> B.     In failing to inspect the leash and its packaging for suitable instructions and warnings before placing it in its stores for retail sale;
> C.     In failing to test the leash for foreseeable safety hazards before placing the leash in its stores for retail sale.

Complaint at ¶¶ 32(A)-(C).

[4]The court notes that Count I of the Complaint contains general allegations common to all counts. Count IX is apparently misnumbered, as there is no Count VIII in the Complaint.

Plaintiffs have filed a timely response to defendants' motion for partial summary judgment. Plaintiffs assert that Minnesota state law rather than Iowa state law should govern in this case and that, therefore, Iowa Code § 613.18(1) has no relevance to their claims. Plaintiffs, alternatively, assert that if Iowa state law does govern, that application of § 613.18(1) constitutes an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution, or is an unconstitutional imposition on plaintiffs' inalienable rights under Article I, Section 1 of the Iowa State Constitution.

## B. *Factual Background*

The summary judgment record reveals that the following facts are undisputed. Plaintiffs Vincent R. Johnson and Julie Johnson are married. The Johnsons are residents of Kossuth County and citizens of the State of Iowa. Defendant Shopko's principal place of business is in the State of Wisconsin. Defendant American Leather is a distributor of pet accessories, and is incorporated and has its principal place of business in the State of New York. Shopko sold pet products distributed by American Leather.

Julie purchased a 26 foot retractable Canine County dog leash, product number 18627, in late March of 2005, from a Shopko store in Fairmont, Minnesota. The leash was used for the first time on Sunday, April 3, 2005, by Vincent without incident. The leash was used for a second time on the morning of April 4, 2005, by Julie, again without incident. On the evening of April 4, 2005, the leash was used for a third time when the Johnsons were walking their 60 pound Labrador Retriever on the county road near their home in rural Kossuth County, Iowa. The leash was extended so that the dog could walk in the ditch. The dog was tugging on the leash when it snapped, causing the cord to recoil and hit Vincent in the left eye.

The dog leash Julie purchased was designed by J.J. Hao and manufactured by Jiangsu Namkwong Industries, Ltd. ("Jiangsu"), 88 Chengebei Wenjing Road, Jiangning Nanjing, China, specifically for American Leather. Jiangsu and J.J. Hao have no known contacts with or presence in the United States. Jiangsu sold the leash at a cost of $10.621 per dozen, or 88 cents per leash.

Defendant American Leather did not assemble, design or manufacture the leash. American Leather holds itself out to the public as a manufacturer of high quality and dependable collars, leashes, harnesses, and accessories for dogs and cats. Defendant American Leather purchased the leash through Ultra Marketing Corp., a marketing representative of manufacturer Jiangsu. Defendant American Leather marketed the leash under the registered trademark "Canine County." Defendant American Leather distributed the leash to Shopko, who, in turn, sold it to Vincent. American Leather sold the leash to Shopko for $2.99 each. Shopko sold the leash to Julie for $6.99. Prior to its distribution and sale of the leash, American Leather did not perform a product safety review of the 26 foot Canine County retractable leash, or any other retractable leash. American Leather does not have a product safety review and/or a safety test report by any independent or third-party that relates to the 26 foot Canine County retractable leash, or any other retractable leash. Neither defendant American Leather nor defendant Shopko altered or modified the leash in any manner prior to sale. The leash reached the Johnsons in the exact same condition and packaging as it was received by American Leather from the manufacturer.

It is alleged that at the time of its sale to American Leather and at the time of its sale by Shopko to Julie, the leash was defective in design and manufacture which allowed the cord to be severed by an unprotected shear point while the leash was being used in its intended manner.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v.*

*Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the

benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

With these standards in mind, the court turns to consideration of defendants' motion for partial summary judgment, taking up first the issue of whether Iowa or Minnesota law applies to the Johnsons' products liability claims.

## B. Choice Of Law

Before analyzing the Johnsons' products liability claims, the court must first resolve which state's law should apply—the law of Iowa, where the Johnsons' reside and where the accident giving rise to this case occurred, or the law of Minnesota, the state where the dog leash at the center of this case was distributed to a Shopko store and subsequently sold to Julie.

The court has previously confronted the often knotty problem of what law applies to specific common-law and statutory claims in a diversity action a number of times. *See John Morrell & Co. v. Halbur*, 476 F. Supp.2d 1061, 1074-1075 (N.D. Iowa 2007); *Jones ex rel. Jones v. Winnebago Indus. Inc.*, 460 F. Supp. 2d 953, 963-975 (N.D. Iowa 2006); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1458 (N.D. Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400, 1402-04 (N.D. Iowa 1995); *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1251-54. (N.D. Iowa 1995). However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Harlan Feeders, Inc.*, 881 F. Supp. at 1404; *accord Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (agreeing with the statement of Judge Richard A. Posner that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.'") *(quoting Barron v. Ford Motor Co. of Canada, Ltd.*, 965 U.S. 195, 197 (7th Cir. 1992), *cert. denied,* 506 U.S. 1001 (1992)). In this case, the Johnsons' assert that

Minnesota law governs and that it is in conflict with Iowa law with respect to nonmanufacturers liability. Iowa Code § 613.18 provides the following limitation on liability for nonmanufacturers of products:

> 1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
>
> a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.
>
> b. Not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability for the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.
>
> 2. A person who is a retailer of a product and who assembles a product, such assembly having no causal relationship to the injury from which the claim arises, is not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability which arises from an alleged defect in the original design or manufacture of the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.
>
> 3. An action brought pursuant to this section, where the claimant certifies that the manufacturer of the product is not yet identifiable, tolls the statute of limitations against such manufacturer until such time as discovery in the case has identified the manufacturer.

IOWA CODE § 613.18. Thus, under Iowa Code § 613.18(1)(a), nonmanufacturers of products are immune from strict-liability claims and implied-warranty-of-merchantability

claims which arise solely from an alleged defect in the product's original design or manufacture of the product. *See Bingham v. Marshall & Huschart Machinery Co.*, 485 N.W.2d 78, 80 (Iowa 1992); *see also Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159, 162 (Iowa 2006); *Weyenhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 824-27 (Iowa 2000); *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 327-28 (Iowa 1996). With respect to § 613.18(1)(b), the Iowa Supreme Court has explained that:

> Paragraph 613.18(1)(b) limits strict liability and implied warranty claims when the claims do not arise solely from an alleged defect in the original design or manufacture of the product. Examples of suits arising under paragraph 613.18(1)(b) include suits under strict liability for failure to warn about the dangers of a product.

*Bingham*, 485 N.W.2d at 80.

Under Minnesota law, there may also be limits on the liability of nonmanufacturers. Minnesota Statutes § 544.41, however, provides:

> **Subdivision 1. Product liability; requirements.** In any product liability action based in whole or in part on strict liability in tort commenced or maintained against a defendant other than the manufacturer, that party shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage. The commencement of a product liability action based in whole or part on strict liability in tort against a certifying defendant shall toll the applicable statute of limitation relative to the defendant for purposes of asserting a strict liability in tort cause of action.
>
> **Subd. 2. Certifying defendant; dismissal of strict liability.** Once the plaintiff has filed a complaint against a manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of a strict liability in tort claim against the certifying defendant, provided

the certifying defendant is not within the categories set forth in subdivision 3. Due diligence shall be exercised by the certifying defendant in providing the plaintiff with the correct identity of the manufacturer and due diligence shall be exercised by the plaintiff in filing a law suit and obtaining jurisdiction over the manufacturer.

The plaintiff may at any time subsequent to dismissal move to vacate the order of dismissal and reinstate the certifying defendant, provided plaintiff can show one of the following:

(a) that the applicable statute of limitation bars the assertion of a strict liability in tort cause of action against the manufacturer of the product allegedly causing the injury, death or damage;

(b) that the identity of the manufacturer given to the plaintiff by the certifying defendant was incorrect. Once the correct identity of the manufacturer has been given by the certifying defendant the court shall again dismiss the certifying defendant;

(c) that the manufacturer no longer exists, cannot be subject to the jurisdiction of the courts of this state, or, despite due diligence, the manufacturer is not amenable to service of process;

(d) that the manufacturer is unable to satisfy any judgment as determined by the court; or

(e) that the court determines that the manufacturer would be unable to satisfy a reasonable settlement or other agreement with plaintiff.

**Subd. 3. Dismissal order prohibited.** A court shall not enter a dismissal order relative to any certifying defendant even though full compliance with subdivision 1 has been made where the plaintiff can show one of the following:

(a) that the defendant has exercised some significant control over the design or manufacture of the product, or has provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the injury, death or damage;

(b) that the defendant had actual knowledge of the defect in the product which caused the injury, death or damage; or

(c) that the defendant created the defect in the product which caused the injury, death or damage.

**Subd. 4. Limiting constructing laws.** Nothing contained in subdivisions 1 to 3 shall be construed to create a cause of action in strict liability in tort or based on other legal theory, or to affect the right of any person to seek and obtain indemnity or contribution.

MINN. STAT. § 544.41. Thus, under Minnesota law, a nonmanufacturer defendant in a strict liability action can be dismissed from a products liability action based on strict liability for injuries caused by a product defect over which it had no control, provided that certain conditions are satisfied. *See In re Shigellosis Litig.*, 647 N.W.2d 1, 6-8 (Minn. Ct. App. 2002) (explaining that § 544.41 "tempers the harsh effect of strict liability as it applies to passive sellers, while ensuring that a person injured by a defective product can recover from a viable source. The seller's-exception statute permits dismissal of strict-liability claims against a seller of a defective product who certifies the correct identity of the manufacturer, but only after a complaint is filed against the manufacturer."); *Marcon v. Kmart Corp.*, 573 N.W.2d 728, 730-731 (Minn. Ct. App. 1998) ("Although a nonmanufacturer defendant in a strict liability action can be absolved of its strict liability for injuries caused by a product defect over which it had no control, it cannot be absolved (and therefore remains strictly liable) if the manufacturer of that

defective product is unable to satisfy the judgment."). Thus, in general, the relief offered nonmanufacturing defendants under Minnesota law for claims of strict liability is always conditional while the immunity offered under Iowa law for such claims can be absolute and without condition. Moreover, claims for breach of implied warranty of merchantability are covered by Iowa Code § 613.18 but not mentioned in Minnesota Statutes § 544.41. As a result of these and other clear differences, the court concludes that the laws of Iowa and Minnesota are in conflict and the court must address the question of what state's law should be applied in this case.

### C. Choice Of Law Rules

In a diversity action such as this, in order to determine what state's law applies to the Johnsons' claims, the court must use the choice-of-law rules of the forum state, in this case, Iowa. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (the conflict-of-laws rules to be applied by a federal court are the rules of the forum state, because "[o]therwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side"); *Allianz Ins. Co. of Canada v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006) ("In a diversity case, a district court sitting in Minnesota applies Minnesota's choice-of-law rules."); *Larken, Inc. v. Wray*, 189 F.3d 729, 732-33 (8th Cir. 1999) ("A federal court must apply the choice of law rules of the forum state—in this case, Iowa."). The court, therefore, turns to consideration of Iowa's conflict-of-laws rules.

As the Iowa Supreme Court explained a decade ago,

> Iowa has abandoned the *lex loci delicti* rule in which the law of the place of injury governs every issue in a tort action. We now follow the Restatement [(Second) of Conflict of Laws]'s "most significant relationship" methodology for choice of law

16

issues. *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987); *Berghammer v. Smith*, 185 N.W.2d 226, 231 (Iowa 1971). The theory behind this approach is that rather than focusing on a single factor, "the court of the forum should apply the policy of the state with the most interest in the litigants and the outcome of the litigation." *Fuerste v. Bemis*, 156 N.W.2d 831, 834 (Iowa 1968).

*Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996). The Iowa Supreme Court in *Veasley* further specifically instructed that, for a tort case, such as the one now before this court,[5]

The most significant relationship test is that which is stated as follows in the Restatement (Second) Conflict of Laws:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

---

[5]This court has repeatedly recognized that the "most significant relationship" test varies depending upon whether the claim at issue sounds in contract or tort. *See, e.g., Sioux Biochem., Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 799 (N.D. Iowa 2005); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 831 n.3 (N.D. Iowa 2004); *L & L Builders Co. v. Mayer Assoc. Servs., Inc.*, 46 F. Supp. 2d 875, 881 (N.D. Iowa 1999); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 23 F. Supp. 2d 974, 1002 (N.D. Iowa 1998); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400, 1405 (N.D. Iowa 1995). While Iowa courts apply RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 to contract claims, they apply RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145(2) to tort claims. *Dethmers*, 23 F. Supp. 2d at 1002 (contract) & 1004 (tort). In this case, where only tort claims are at issue, the "most significant relationship" test is set forth in § 145(2), as stated in the quotation from *Veasley*, above.

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement (Second) Conflict of Laws § 145 (1971).

We recognized in *Joseph L. Wilmotte & Co. v. Rosenman Brothers*, 258 N.W.2d 317, 326 (Iowa 1977), that the situation-specific sections of the Restatement, such as section 145, incorporate the provisions set forth in section 6 thereof. These principles are as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) Where there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the rule to be applied.

Restatement (Second) Conflict of Laws § 6 (1971).

*Id*. at 897-98. As Restatement § 145 states, the "contacts" listed in § 145(2) "are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145(2). Thus, the court will determine the relative importance of the various § 145(2) "contacts," as well as whether those "contacts" weigh in favor of application of Minnesota or Iowa law, then consider the § 6 "factors" in light of the pertinent "contacts."

### D.  The § 145(2) "Contacts"

#### 1.     The place where injury occurred

The Iowa Supreme Court has recognized that, among the § 145(2) "contacts," the "place where the injury occurred"—here, Iowa—has little importance, at least where the state that is the place of injury has no other interest in the case. *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987). Moreover, in *Harlan Feeders*, this court noted that rejection of the "place of injury" as a determinative factor was in keeping with the Iowa courts' rejection of the longstanding rule of *lex loci delecti*. *Harlan Feeders, Inc.*, 881 F.3d at 1409 (citing *Zeman v. Canton State Bank*, 211 N.W.2d 346, 348 (Iowa 1973)). Defendants concede that this factor is not controlling. Because the court cannot determine the appropriate choice of law based solely on the "place of injury," the court must consider, on the basis of other "contacts," whether Iowa has an interest based on anything more than being the "place of injury." *See Cameron*, 407 N.W.2d at 597 (the "place where the injury occurred" has little importance, at least where the state that is the place of injury has no other interest in the case); *cf. Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1360 (8th Cir. 1994) (applying Missouri law, the court considered whether the plaintiff's place of injury bore a strong relationship to the occurrence and the parties based on other § 145(2) contacts).

## 2. *The place where conduct causing the injury occurred*

Turning to the next § 145(2) "contact," the court must determine which state is the "place where conduct causing the injury occurred." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(b). The court notes that neither party has addressed this issue in their briefs. One choice here is Iowa, where the leash snapped while Vincent was using it to walk the Johnsons' dog, causing Vincent to suffer his eye injuries. The other choice is Minnesota, where the dog leash was distributed and marketed.

Courts have recognized in products liability cases that the place where the allegedly defective product was designed, marketed, or manufactured is "the place where the conduct causing the injury occurred," and have given significant weight to that factor in the conflict-of-laws calculus. *See, e.g., McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 426 (5th Cir. 2001) (Texas had the most significant relationship to a products liability claim, even though the plaintiff was injured in Canada, in part because Texas was the place where the conduct giving rise to his injuries occurred, where Texas was the place where the helicopter was marketed and manufactured, and where the service bulletins and records concerning the operation of the aircraft were sent and maintained); *MacDonald v. General Motors Corp.*, 110 F.3d 337, 342 (6th Cir. 1997) (the "place of conduct causing injury" was Tennessee, the sight of the accident, and Michigan, the state where the defendant designed the allegedly defective van). This court, likewise, concludes that, in a products liability case such as this, in which the plaintiffs allege defective design, defective manufacture, or defective warnings, the place where conduct causing injury is, at least primarily, the location where the design, manufacture, and marketing of the

allegedly defective product occurred.  In this case, the place where the product in question was marketed is Minnesota.[6]

In addition, in a products liability case, the place where the design, manufacture, and marketing conduct relating to the allegedly defective product occurred is of relatively greater weight than "the place of injury," at least in the absence of evidence that other conduct substantially contributing to the injury also occurred in the place of injury.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (the § 145(2) contacts "are to be evaluated according to their relative importance with respect to the particular issue"); *see also id.*, cmt *e* ("When . . . the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.").  Therefore, the "contact" identified in § 145(2)(b) as the "place where the conduct causing injury occurred" suggests that Minnesota has the greater interest in application of its law to this case.

### 3.    *Place of domicile, residence, incorporation, or business*

The third § 145(2) "contact" is "the domicile, residence, nationality, place of incorporation, and place of business of the parties."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(c).  There is clearly a division here between Iowa as the Johnsons' residence at the time of Vincent's accident, and Wisconsin, defendant Shopko's principal place of business, or New York, the state in which defendant American Leather is incorporated and has its principal place of business.  As Comment *e* to § 145 explains,

> In the case of other torts [*i.e.*, other than reputation,
> financial, or privacy torts], the importance of [the § 145(2)(c)]

---

[6]The court notes that the leash was designed and manufactured in neither Iowa or Minnesota, but in the Peoples Republic of China.

> contacts depends largely upon the extent to which they are
> grouped with other contacts. The fact, for example, that one
> of the parties is domiciled or does business in a given state will
> usually carry little weight of itself. On the other hand, the fact
> that the domicile and place of business of all parties are
> grouped in a single state is an important factor to be
> considered in determining the state of the applicable law. The
> state where these contacts are grouped is particularly likely to
> be the state of the applicable law if either the defendant's
> conduct or the plaintiff's injury occurred there. This state may
> also be the state of the applicable law when conduct and injury
> occurred in a place that is fortuitous and bears little relation to
> the occurrence and the parties (see § 146, Comments d-e).

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. *e*. Here, the Johnsons'

residence in Iowa does "group" with the "place of injury." *See Dorman*, 23 F.3d at 1359

(finding the plaintiff's domicile in Canada was significant when Canada was also the place

of injury and the place where the plaintiff purchased and used the allegedly defective

product). On the other hand, neither Shopko or American Leather's place of business

groups with their conduct allegedly causing injury. Therefore, the § 145(2)(c) "contacts"

weigh in favor of Iowa.

### 4. *Place where the relationship was centered*

The final § 145(2) "contact" is "the place where the relationship, if any, between

the parties is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(d).

Again, the parties have not addressed this factor in their briefs. From the limited record

before the court, there is no basis to find that there was *any* "relationship" between the

Johnsons and either of the defendants or that the injury was caused by an act done in the

course of such a relationship, where the Johnsons and the defendants had no contractual

or other relationship, and the connection of the Johnsons with the defendants leading to the

tragic accident was merely "fortuitous." The RESTATEMENT expressly contemplates that

there may be no "place where the relationship is centered." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(d) (a pertinent contact is "the place where the relationship, *if any*, between the parties is centered") (emphasis added); *see id.*, cmt. *e* (considering the place where the relationship between the parties is centered "[w]hen there is a relationship between the plaintiff and the defendant"). Thus, the court concludes that the "place where the relationship is centered" is not a relevant "contact" here, because there simply was no "relationship" between the Johnsons and the defendants, apart from the fortuity of the accident.

### 5.    *Summary of § 145(2) contacts*

The analysis above shows that this case involves the following § 145(2) "contacts": The "place of injury" is Iowa, but that "contact" is of slight rather than "presumptive" importance; the "place where the conduct causing the injury occurred" is partially in Minnesota since much of the alleged conduct causing injury occurred outside the United States; the Johnsons' residence in Iowa can be "grouped" with other contacts so that their contact with Iowa is of considerably greater weight; and there is no place where the relationship between the Johnsons and defendants is centered. Thus, based on the § 145(2) "contacts," Iowa has the dominant interest of the nominee states.

### E.    *The § 6 Factors*

The court's consideration of the § 145(2) "contacts" is not the end of the conflict-of-laws analysis, however, because as § 145(1) makes clear, the question is which state "has the most significant relationship to the occurrence and the parties under the principles stated in § 6," *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1), and also makes clear that the § 145(2) "contacts" are merely the "[c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue. . . ." *Id.* at

§ 145(2); *accord Veasley*, 553 N.W.2d at 898 ("[T]he situation-specific sections of the Restatement, such as section 145, incorporate the provisions set forth in section 6 thereof."). Therefore, the court must now consider the § 6 "principles," at least to the extent that the court finds that they are implicated here, in light of the pertinent § 145(2) "contacts."

The Comments to § 145 explain that "[t]he factors in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field." *Id.*, cmt. *b*. More specifically, the Comments explain that the § 6 factors of relatively greater importance for a tort action are "the needs of the interstate and international systems [§ 6(2)(a)], the relevant policies of the forum [§ 6(2)(b)], the relevant policies of other interested states [§ 6(2)(c)] and particularly of the state with the dominant interest in the determination of the particular issue, and the ease in the determination and application of the law to be applied [§ 6(2)(g)]." *Id.*; *cf. Veasley*, 553 N.W.2d at 898 (also discounting, in an automobile accident case, the importance of the factors in § 6(2)(d) and (f), but finding that the factor in (g) was "of little importance" in such a case, because the defendant would either be held liable or it would not, without any "esoteric or complex substantive laws . . . involved"). The court will consider these relatively more important factors in turn.

### 1. Needs of the interstate and international systems

The Comments to § 6 concerning "the needs of the interstate and international systems," the factor identified in § 6(2)(a), provide little insight, because they are concerned with *what choice-of-law rules* further the needs of the interstate and international systems, rather than with *what forum's substantive law* furthers the needs of the interstate and international systems. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6, cmt. *d*. Of more help is the observation of the Iowa Supreme Court in *Veasley*, that "[r]espect for interstate and international systems is maintained when the forum state, when

choosing to apply its own law, has a 'substantive connection' with the issue." *Veasley*, 553 N.W.2d at 899) (quoting *Milkovich v. Saari*, 203 N.W.2d 408, 417 (Minn. 1973)). Focusing on whether or not there was such a "substantive connection," the Iowa Supreme Court concluded in *Veasley* that Iowa's owner's liability law, which was at issue in that case, "is not so abnormal that an application of Iowa law would greatly disrupt interstate order." *Id.* Similarly, here, based on consideration of the § 145(2) "contacts" above, which reveal that Iowa is the state with the "dominant" interest, Iowa has an appropriate "substantive connection" with the products liability and other tort issues (such as damages and comparative fault) involved in this case so that "[r]espect for interstate and international systems is maintained" by choosing Iowa law as the applicable law. *Id.* Moreover, Iowa's products liability, comparative fault, and damages laws are "not so abnormal that an application of Iowa law would greatly disrupt interstate order" in this case, either. *Cf. id.* Therefore, this factor supports the application of Iowa law.

## 2.  *Relevant policies of the forum and other interested states*

The second and third relatively more important § 6 factors in a tort case are "the relevant policies of the forum," RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(b), and "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," *id.* at § 6(2)(c), respectively. *Id.* § 145, cmt. *b* (identifying these factors as ones of relatively greater importance in a tort case); *cf. Veasley*, 553 N.W.2d at 898 (also discounting, in an automobile accident case, the importance of other § 6(2) factors). The Comments to § 145 indicate that what is of particular concern with regard to the § 6(2)(c) factor is the policies of "the state with the dominant interest in the determination of the particular issue." *Id.* at § 145, cmt. *b*. Thus, these two factors should logically be considered together here, where Iowa is both the

forum state and the state that this court has determined has the dominant interest in the issues in this case, based on the § 145(2) "contacts."

The difficulty facing the court with respect to these two factors is that the parties have provided no discussion whatsoever regarding the polices behind the general tort and products liability laws of the two nominee states, Iowa and Minnesota, nor have the parties offered any discourse about which state's interests are, consequently, most implicated. The court notes that the Iowa Court of Appeals has provided some concrete guidance when it observed that the rationale for restitution under criminal law and the rationale for tort under civil law are similar: "A wrong has been done. A person has been injured or property damaged. The victim deserves to be fully compensated for the injury by the actor who caused it." *State v. Ihde*, 532 N.W.2d 827, 829 (Iowa Ct. App. 1995); *see also Hartley State Bank v. McCorkell*, 91 Iowa 660, 60 N.W. 197, 199 (1894) (noting that, where the plaintiff's action sounded in tort, rather than contract, "the purpose of the law is to fully compensate him for all that he lost by the wrongful act"). Thus, the policy goal of Iowa tort law appears to be to "fully compensate" tort victims. This policy goal is identical under Minnesota tort law. *See Bigelow v. Halloran*, 313 N.W.2d 10, 12 (Minn. 1981) ("this court has often said that it is in the interest of this state to see that tort victims are fully compensated."); *see also Jepson v. General Cas. Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn. 1994) (observing that "Minnesota places great value in compensating tort victims."); *Jacobson v. Universal Underwriters Ins. Group*, 645 N.W.2d 741, 746-47 (Minn. Ct. App. 2002) (noting that it was Minnesota's "important governmental interest" in seeing that all tort victims are fully compensated); *Gimmestad v. Gimmestad*, 451 N.W.2d 662, 666 (Minn. Ct. App.1990) ("Minnesota is interested in seeing that 'tort victims are fully compensated.'" ) (quoting *Bigelow*, 313 N.W.2d at 12). Iowa's interest in this litigation, however, is not founded solely on an interest in fully compensating tort

victims, Iowa has a further interest in application of its law because the allegedly tortious conduct occurred in Iowa. Therefore, where the court has determined, based on the § 145(2) "contacts," that Iowa's interest is "dominant," the § 6 "factors" requiring consideration and comparison of the policies and relative interests of the nominee states also weigh in favor of application of Iowa law in this case. Accordingly, the § 6(2)(b) and (c) factors weigh in favor of application of Iowa law.

### 3. *Ease of determination and application of the law*

The final § 6(2) factor of relatively greater significance in a tort case—at least according to Comment *b* to RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145—is the § 6(2)(g) factor, "ease in the determination and application of the rule to be applied." In *Veasley*, however, the Iowa Supreme Court observed that this factor was "of little importance" in the case before it, because "[e]ither [the defendant] may be held liable or it may not," and because "[n]o esoteric or complex substantive laws are involved." *Veasley*, 553 N.W.2d at 898. Similarly, here, this court finds no significant impediment to its ability to determine and apply either Iowa or Minnesota law. Thus, this factor is "of little importance" here. *Id.*

### 4. *Other § 6(2) factors*

The remaining § 6(2) factors may be of relatively lesser importance in this tort case. Those factors are "(d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, [and] (f) certainty, predictability, and uniformity of result." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(d)-(f). The parties have not discussed any of these factors in their briefs. Nonetheless, the court will consider them.

### a. Protection of justified expectations

In *Veasley*, the Iowa Supreme Court observed that "[t]he protection of justified expectations is, according to several modern authorities, of scant relevance in automobile cases." *Veasley*, 553 F.3d at 898. The court explained that this was so in the case before it, because "'no one plans to have an accident.'" Similarly, this factor is of "scant importance" in this products liability case: No one planned to have an accident with the dog leash here. Moreover, Iowa's products liability law is not so abnormal that defendants would be surprised by its rules; and Shopko sold the leash to Iowa residents, so that Shopko could have reasonably foreseen that Iowa law would apply to a tort action involving an allegedly defective dog leash. Thus, nothing about this purportedly less important factor weighs against the application of Iowa law.

### b. Basic underlying policies

For some of the same reasons, "the basic policies underlying the particular field of law," RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(e), certainly do not weigh against application of Iowa law. Tort law generally, and products liability law in particular, is concerned with compensation of victims, whether under Iowa law, *see Ihde*, 532 N.W.2d at 829, or under Minnesota law. *See Bigelow*, 313 N.W.2d at 12. Again, Iowa tort and products liability law is not so abnormal that it is out of step with the policies underlying the particular fields of law at issue here.

### c. Certainty, predictability and uniformity of result

The final § 6 factor is "certainty, predictability, and uniformity of result," RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(f). Because the ease with which the law of Iowa can be determined is on par with that of Minnesota, application of either states's products liability laws will achieve predictability and uniformity of results. Thus, the court concludes that this last factor in § 6 is neutral in this case.

### F. Conclusion As To Conflict Of Law

Upon consideration of the § 145(2) "contacts" and the § 6 "factors" that make up the "most significant relationship" test for conflict-of-laws determinations under Iowa law, the court concludes that Iowa has the dominant interest in the issues presented and that application of Iowa law is in keeping with the pertinent factors. Therefore, the substantive legal issues in this case will be governed by Iowa law.

### G. Federal Constitutionality of Iowa Code § 613.18(1)

Having concluded that Iowa law will govern in this case, the court turns to the Johnsons' contention that application of Iowa Code § 613.18(1), to them, constitutes an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Specifically, the Johnsons assert that when the State of Iowa enacted the tort reform scheme in § 613.18(1), in the passage of 86 Iowa Acts chapter 1211, § 32, it deprived them of previously held causes of action under the common law, claims in a products liability lawsuit against a nonmanufacturer of a product for strict liability and breach of implied warranty of merchantability, without just compensation.

### 1.  Overview of the Fifth Amendment's Takings Clause

The Takings Clause of the Fifth Amendment of the United States Constitution states, in relevant part, "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001); *Dolan v. City of Tigard*, 512 U.S. 374, 383-84 (1984). The United States Supreme Court has explained that, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enters. v. Apfel*, 524 U.S. 498, 522 (1998)

(citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *see also Palazzolo*, 533 U.S. at 618. The Court has distinguished between the actual, physical taking of real property and those government actions where property is effected by government regulations. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537-38 (2005); *Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321 (2002); *Palazzolo*, 533 U.S. at 618. As the Court observed in *Palazzolo*:

> The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use. Our cases establish that even a minimal "permanent physical occupation of real property" requires compensation under the Clause. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S. Ct. 3164, 73 L. Ed.2d 868 (1982). In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Id.*, at 415, 43 S. Ct. 158.

*Palazzolo*, 533 U.S. at 617.

The Eighth Circuit Court of Appeals has developed a two-part test to evaluate whether a governmental action constitutes a taking of private property without just compensation. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439-441 (8th Cir. 2007). Under the first prong of this test, the court must evaluate whether the plaintiff has "property interests protected by the Takings Clause." *Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-03 (1984) and *Texas State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir.

2005)). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Therefore, the court looks to state law to determine what constitutes a property right. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980); *see also Roth*, 408 U.S. at 577. Thus, in this case, Iowa law defines what is property. *See Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439 (looking to Iowa law to evaluate whether plaintiff had constitutionally protected property interests). If the court determines that a property interest exists, the second prong of the test requires the court to determine whether a taking has occurred. *Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 440.

### 2. Cognizable property interest

As noted above, the court must look to Iowa law to evaluate whether the Johnsons had constitutionally protected interests. *See Beckwith*, 449 U.S. at 161; *see also Roth*, 408 U.S. at 577; *Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439. Iowa Code § 4.1(24) defines property as follows: "The word 'property' includes personal and real property." "Personal property" in turn is defined in Iowa Code § 4.1(21) as: "The words 'personal property' include money, goods, chattels, evidences of debt, and things in action." The Iowa Supreme Court has observed that "[a] 'chose in action' is the same thing as a 'thing in action.'" *Arbie Mineral Feed v. Farm Bureau Mut. Ins. Co.*, 462 N.W.2d 677, 680 (Iowa 1990) (citing *Brenton Bros. v. Dorr*, 239 N.W. 808, 811-12 (1931)). The term "things in action" includes causes of action. *See Chrysler Credit Corp. v. Rosenberger*, 512 N.W.2d 303, 304 (Iowa 1994) (noting that a cause of action is one of the "other things in action" that may be levied upon); *Arbie Mineral Feed*, 462 N.W.2d

at 680 ("A cause of action is in existence prior to judgment and is personal property upon which, under Iowa law, a creditor may levy."); *Citizens State Bank v. Hansen*, 449 N.W.2d 388, 389 (Iowa 1989) (noting that "things in action," though not subject to levy at common law, can be reached by execution under Iowa law). Moreover, the court notes that the United States Supreme Court has recognized that "[a] cause of action has been described as a 'species of property protected by the Fourteenth Amendment's Due Process Clause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

Nonetheless, the inherent flaw in the Johnsons' property interest claim lies in the fact that while 86 Iowa Acts chapter 1211, § 32 was enacted and codified at Iowa Code § 613.18 in 1986, the Johnsons' cause of action did not accrue until 2005. The Johnsons had no vested right in the former Iowa law. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88 n. 32 (1978) ("Our cases have clearly established that '[a] person has no property, no vested interest, in any rule of the common law.'"); *New York Cent. R.R. v. White*, 243 U.S. 188, 198 (1917) ("No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit."); *Edding ex rel. Eddings v. Volkswagenwerk, A.G.*, 835 F.2d 1369, 1374 (11th Cir. 1998) (holding that plaintiffs had no vested interest in former interpretation of state law); *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir. 1986) ("No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit." ); *Ducharme v. Merrill-Nat'l Laboratories*, 574 F.2d 1307, 1309 (5th Cir.) ("[A] plaintiff has no vested right in any tort claim for damages under state law."), *cert. denied*, 439 U.S. 1002 (1978). Thus, the Iowa legislature clearly had the constitutional authority to enact the type of tort reform scheme at issue in Iowa Code § 613.18 even if its enactment served to deprive the Johnsons of some previously held causes of action

under the common law. Therefore, the court concludes that application of Iowa Code § 613.18(1) to the Johnsons does not constitute an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

### 3.     *Taking of property*

Having concluded that the Johnsons' had no vested property interest in Iowa's former common law, the court need not consider whether Iowa Code § 613.18(1), as applied to the Johnsons, gives rise to an unconstitutional taking of the Johnsons' personal property in violation of the Fifth Amendment. Nevertheless, even if the court were to assume *arguendo* that the Johnsons did have a property interest in a former cause of action under Iowa law, the court concludes that a taking without compensation of the Johnsons' property has not occurred here.

The United States Supreme Court has observed that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." Armstrong, 364 U.S. at 48. Rather, under taking jurisprudence, the United States Supreme Court has recognized two types of takings:

> (1) per se, involving the "direct government appropriation of or physical invasion of private property"; and (2) regulatory, where a regulation affecting private property "goes too far."

*Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 440 (quoting *Lingle*, 544 U.S. at 537-38). The court does not read the Johnsons' moving papers to alleged a per se taking in this case nor does the summary judgment record reveal any direct government appropriation of or physical invasion of the Johnsons' private property in this case. Therefore, the court turns to the question of whether a regulatory taking of the Johnsons' causes of action occurred by virtue of operation of Iowa Code § 613.18(1).

33

In *Penn Central Transportation v. New York City*, 438 U.S. 104 (1978), the United States Supreme Court, in setting out a framework for evaluating whether legislation will constitute a regulatory taking without just compensation, stated:

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. *See Goldblatt v. Hempstead*, *supra*, 369 U.S., at 594, 82 S. Ct., at 990. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e. g., United States v. Causby*, 328 U.S. 256, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id*. at 124. In considering the type of analytical analysis required under the *Penn Central* decision, the Eighth Circuit Court of Appeals has observed that:

> *Penn Central* provides "no set formula" to determine when the Fifth Amendment requires compensation. "Whether a particular restriction amounts to a taking depends on the circumstances of each case." *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 694 (8th Cir. 1996). Factors to consider in this "ad hoc, factual inquiry" include: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the government regulation." *Id*. The first two factors are "primary"; the third "may be relevant in determining whether a taking has occurred." *Lingle*, 544 U.S. at 538-39, 125 S. Ct. 2074.

*Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 441-42. The court will consider each of the *Penn Central* factors in turn.

The first *Penn Central* factor requires the court to consider the economic impact of the regulation on the Johnsons. The Johnsons assert that by virtue of Iowa Code § 613.18(1) they are left with only one cause of action in this case and that cause of action, failure to place suitable warnings on the leash, is less viable than their strict liability and breach of warranty claims. This argument ignores the fact that such strict liability claims and breach of warranty claims might have been brought against the actual manufacturer and designer of the dog leash, albeit with more difficulty and in a different court. Moreover, the court notes that if the Johnsons are successful with their failure to warn claim against defendants they are entitled to be fully compensated for their injuries. Thus, the court concludes that the Johnsons have not demonstrated that Iowa Code § 613.18(1) will have a significant economic impact on them. Therefore, this factor weighs against a finding that operation of Iowa Code § 613.18(1) will constitute a taking.

Neither party has addressed the second *Penn Central* factor, concerning the extent to which Iowa Code § 613.18(1) has interfered with distinct, investment backed expectations. The court is unaware of any investment backed expectations which the Johnsons had in the causes of action bared by Iowa Code § 613.18(1). Therefore, this factor also weighs against a finding that operation of Iowa Code § 613.18(1) will constitute a taking.

Finally, the court must consider the character of the government action. Neither party has addressed this factor in their briefs. Moreover, the court's research has revealed precious little in the way of legislative history of Iowa Code § 613.18. The court notes that with the adoption of 86 Iowa Acts chapter 1211, section 32, codified at Iowa Code

§ 613.18, a statutory limitation was imposed upon strict liability and implied warranty claims against nonmanufacturers. The Iowa Supreme Court has observed that:

> Iowa Code section 613.18 is designed to expose a seller or distributor, who is not the assembler, designer or manufacturer, to liability in a products liability action only where two conditions are satisfied: One, the products liability action must not be based solely on an alleged defect in the original design or manufacture of the product, and two, the manufacturer must either not be subject to the jurisdiction of the courts of this state or have been judicially declared insolvent.

*Pepper v. Star Equip., Ltd.*, 484 N.W.2d 156, 160 (Iowa 1992). As indicated above, Iowa Code § 613.18 does not deprive the Johnsons of their ability to bring strict liability claims and breach of implied warranty of merchantability claims in a products liability lawsuit. Rather, it only precludes nonmanufacturers from being the target of such claims. The court concludes that this factor weighs neither in favor of nor against a finding that operation of Iowa Code § 613.18 will constitute a taking.

Weighing the *Penn Central* factors here, it is clear that Iowa Code § 613.18(1), as applied to the Johnsons, does not amount to an unconstitutional taking of the Johnsons' personal property in violation of the Fifth Amendment.

## H. Iowa's Inalienable Rights Clause

The court next takes up the Johnsons' contention that application of Iowa Code § 613.18(1) to them constitutes a violation of the Iowa State Constitution's Inalienable Rights Clause, IOWA CONST. art. I, § 1. The first section of the Iowa Constitution's declaration of rights provides:

> All men are, by nature, free and equal, and have certain inalienable rights-among which are those of enjoying and *176

36

> defending life and liberty, acquiring, possessing and protecting
> property, and pursuing and obtaining safety and happiness.

IOWA CONST. art. I, § 1. The Iowa Supreme Court has acknowledged that "the constitutional protection embodied in Iowa's Inalienable Rights Clause 'is not a mere glittering generality without substance or meaning.'" *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 176 (Iowa 2004) (quoting *State v. Osborne*, 171 Iowa 678, 693, 154 N.W. 294, 300 (1915)). The Iowa Supreme Court has held that the Inalienable Rights Clause "was intended to secure citizens' pre-existing common law rights (sometimes known as 'natural rights') from unwarranted government restrictions." *Gacke*, 684 N.W.2d at 176; *accord Atwood v. Vilsack*, 725 N.W.2d 641, 651 (Iowa 2006) (noting that the inalienable rights clause secure Iowa common law rights that pre-existed Iowa's Constitution.); *May's Drug Stores v. State Tax Comm'n*, 242 Iowa 319, 329, 45 N.W.2d 245, 250 (1950) ("The property right which is secured by this section of the constitution is the pre-existing common law right . . ."). Nonetheless, the Iowa Supreme Court has pointed out that:

> It is well-established that the protections of Iowa's inalienable rights clause are not absolute. *See Gacke*, 684 N.W.2d at 176. The clause does not prevent all legislative action taken pursuant to the police power that benefits the community and impacts an inalienable right (i.e. a common law or natural right). *See id*. Instead, it prevents only arbitrary, unreasonable legislative action that impacts an inalienable right. See id. (citing *Gibb v. Hansen*, 286 N.W.2d 180, 186 (Iowa 1979); *May's Drug Stores*, 242 Iowa at 329, 45 N.W.2d at 250; *Benschoter v. Hakes*, 232 Iowa 1354, 1361, 8 N.W.2d 481, 485 (1943); *State v. Osborne*, 171 Iowa 678, 693, 154 N.W. 294, 300 (1915)).

*Atwood*, 725 N.W.2d at 652; *accord Midwest Check Cashing, Inc. v. Richey*, 728 N.W.2d 396, 403 (Iowa 2007) (quoting *Atwood*, 725 N.W.2d at 652).

Thus, in determining whether Iowa Code § 613.18 violates article I, section 1 of the Iowa Constitution, the court must determine (1) whether the right asserted by the Johnsons is protected by Iowa's Inalienable Rights Clause; (2) whether § 613.18 impacts the asserted inalienable right, and if so, (3) whether § 613.18 is a reasonable exercise of the state's police power. See *Midwest Check Cashing, Inc.*, 728 N.W.2d at 403; *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 176 (Iowa 2004) (citing *Steinberg-Baum & Co. v. Countryman*, 247 Iowa 923, 929-30, 77 N.W.2d 15, 18-19 (1956)). Accordingly, the court must first consider whether the Johnsons' ability to assert claims against a nonmanufacturer for strict liability in tort or breach of implied warranty of merchantability arising from an alleged defect in the original design or manufacture of a product is a right protected by article I, section 1 of the Iowa Constitution.

As the court noted above in its taking analysis, it is significant that, while 86 Iowa Acts chapter 1211, § 32 was enacted and codified at Iowa Code § 613.18 in 1986, the Johnsons' cause of action did not accrue until 2005. The Iowa Court of Appeals has held that a litigant does not have a vested right in any rule of the common law, such that a cause of action which has not yet accrued are not vested and may be abolished. *See Carter v. Rowe*, 710 N.W.2d 545, 2005 WL 3478144, at *2 (Iowa Ct. App. 2005) (table decision). In *Carter*, the plaintiff contested the constitutionality of the Iowa Equine Activity Liability Act, Iowa Code Chapter 673. *Id.*, 710 N.W.2d 545, 2005 WL 3478144, at *2. The plaintiff, who had been thrown from a horse owned by her father, brought suit against her father for her injuries. The Iowa Equine Activity Liability Act immunizes "the owner of a domesticated animal" when an injury results from "the inherent risks of a domesticated animal activity" and restricts liability for injuries, death, or damages to those "committed intentionally [or] recklessly." IOWA CODE § 673.2. Prior to the adoption of the Iowa Equine Activity Liability Act, Iowa common law permitted liability for injuries caused by

a domesticated animal based on a simple negligence standard. *Carter*, 710 N.W.2d 545, 2005 WL 3478144, at *1 (citing *Nikolas v. Kirner*, 73 N.W.2d 7, 9 (Iowa 1955)). Following a jury trial in which the defendant prevailed, the plaintiff appealed and challenged, *inter alia*, the constitutionality of Chapter 673's heightened standard of fault on the ground that it violated Iowa's Inalienable Rights Clause. *Id.* The Iowa Court of Appeals, in upholding the constitutionality of Chapter 673, held that the statutory immunity found in Chapter 673 did not violate the Inalienable Rights Clause since the plaintiff did not have a vested right in any rule of the common law, her cause of action, which had not yet accrued at the time of the Iowa Equine Activity Liability Act's passage, was therefore not vested at the time of the Act's passage and was subject to being abolished. *Id.* at 710 N.W.2d 545, 2005 WL 3478144, at *2. Likewise here, the Johnsons' cause of action had not yet accrued at the time of 86 Iowa Acts Chapter 1211, § 32's enactment and was thus not vested at the time of the act's passage and was subject to being abolished. *See id.* Accordingly, the court concludes that Iowa Code § 613.18 does not violate the Inalienable Rights Clause of the Iowa State Constitution, Iowa Const. art. I, § 1.

## I. Application Of Iowa Code § 613.18(1)

Having concluded that application of Iowa Code § 613.18(1) does not constitute an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution, nor is it violative of the Inalienable Rights Clause of the Iowa State Constitution, the court is left to apply it to the Johnsons' claims in this case. Section 613.18(1) provides that defendants Shopko and American Leather, who were not the assembler, designer, or manufacturer of the dog leash at the center of this case are "[i]mmune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or

manufacture of the product." IOWA CODE § 613.18(1)(a).[7] Based on application of Iowa Code § 613.18(1)(a), defendants seek dismissal of all of the Johnsons' claims in this case except for the Johnsons' failure to warn claim contained in Count V(C). The Johnsons do not contest defendants' assertion that application of § 613.18(1)(a) requires the dismissal of all their claims except their failure to warn claim contained in Count V(C). Nonetheless, the court sees no basis to dismiss the breach of express warranty claim found in Count III. Accordingly, the court will not grant defendants' motion at to that claim. Therefore, defendants American Leather and Shopko's Motion For Partial Summary Judgment is granted in part and denied in part.

## III. CONCLUSION

For the reasons set out above, the court grants in part and denies in part defendants American Leather and Shopko's Motion For Partial Summary Judgment. Accordingly, Counts II, IV, V(A) & (B), VI and VII of the Complaint are dismissed.

**IT IS SO ORDERED.**

**DATED** this 29th day of September, 2008.

_Mark W. Bennett_

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[7] As noted above, § 613.18(1)(b) "limits strict liability and implied warranty claims when the claims do not arise solely from an alleged defect in the original design or manufacture of the product." _Bingham_, 485 N.W.2d at 80.